UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X Case No. 1:23-cv-10102 (JSR)
AARON RICHARD GOLUB, ESQUIRE, P.C.
and AARON RICHARD GOLUB,

Plaintiffs,

**FIRST AMENDED
COMPLAINT
(Jury Trial Demanded)**

-against-

TIMOTHY BLUM and BLUM & POE, LLC, now
known as BLUM LOS ANGELES LLC and doing
business as BLUM,

Defendants.
------------------------------------------------------------------X

Plaintiffs AARON RICHARD GOLUB, ESQUIRE, P.C. ("ARGPC") and

AARON RICHARD GOLUB ("ARG") (collectively, "Plaintiffs"), by their attorney,

AARON RICHARD GOLUB, ESQUIRE, P.C., as and for their FIRST AMENDED

COMPLAINT, allege as follows:

1.     At all times hereinafter mentioned, Plaintiff ARGPC was and is a

professional corporation duly organized and existing under the laws of the State of New

York with an office and principal place of business located at 24 East 64th Street, Fifth

Floor, New York, New York 10065.  ARGPC was and is engaged in the business of

rendering professional legal counsel.

2.     At all times hereinafter mentioned, Plaintiff ARG was and is an attorney

duly licensed to practice law in the City, County and State of New York and is the

principal of Plaintiff ARGPC.  ARG was and is engaged in the practice of law with an

office at 24 East 64th Street, Fifth Floor, New York, New York 10065.

3.      Upon information and belief, Defendant BLUM & POE, LLC ("BPLLC"),
now known as BLUM LOS ANGELES LLC ("BLALLC") and doing business as BLUM
(collectively "Blum"), was and is a limited liability company duly organized and existing
under the laws of the State of California.  Defendant Blum is an art gallery principally
engaged in the art business.  Upon information and belief, Blum is authorized to conduct
business in the State of New York and is registered with the New York State Department
of State as a California foreign limited liability company.  On its website at
https://www.blum-gallery.com/about, Blum states that it has offices in and conducts
business in:

     i.      Los Angeles
          2727 South La Cienega Boulevard
          Los Angeles, California 90034;

     ii.     New York
          19 East 66th Street
          New York, New York 10065; and

     iii.    Tokyo
          Harajuku Jingu-no-mori 5F
          1-14-34 Jingumae
          Shibuya, Tokyo 150-0001.

4.      Upon information and belief, Defendant Timothy Blum ("TB") is the
principal member or owner of Blum and resides at 2840 Seattle Drive, Los Angeles,
California 90046.  Upon information and belief, TB abused and continues to abuse the
corporate form by dominating and controlling the affairs and assets of Blum, freely
transferring funds between Blum and TB.  Upon information and belief, at all relevant
times, Defendants TB and Blum were and are alter egos of each other.

## JURISDICTION

5.      This action was commenced on October 24, 2023 in the Supreme Court of the State of New York, New York County, by e-filing a Summons and Complaint on the New York State Courts Electronic Filing system (Dkt. 1, ¶1; see also Dkt. 2-1).[1]  On November 16, 2023, Defendants filed a Notice of Removal (Dkt. 1) purportedly pursuant to 28 U.S.C. §§1332, 1441 and 1446, removing this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.  Defendants' Notice of Removal alleges that this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy is greater than $75,000, exclusive of interest and costs (Id., ¶7 and "PLEASE TAKE NOTICE" clause).

6.      Plaintiffs' Federal subject matter jurisdictional allegations herein are based solely and entirely on the contents of Defendants' Notice of Removal and the allegations therein.  Plaintiffs' following allegations of Federal subject matter diversity jurisdiction are alleged and submitted without Plaintiffs waiving any defenses whatsoever, including, without limitation, any and all subject matter jurisdictional defenses.

7.      Without prejudice to any and all of Plaintiffs' rights, Defendants, in their Notice of Removal (Id., ¶¶ 7-18), allege, inter alia, the following as the basis of their removal to this Court:

    i.      Diversity jurisdiction pursuant to 28 U.S.C. §1332 allegedly exists because Plaintiffs and Defendants are citizens of different states and the amount in controversy is greater than $75,000, exclusive of interest and costs (Id., ¶7);

---

[1] "Dkt __" means the docket number of the document filed in the subject action via the U.S. District Court Southern District of New York Official Court Electronic Document Filing System (https://pacer.login.uscourts.gov).

ii.     Defendants allege that Plaintiff ARGPC is a citizen of the State of New York because Plaintiff ARGPC is a professional corporation duly organized and existing under the laws of the State of New York with an office and principal place of business located in the State of New York (Id., ¶8);

iii.    Defendants allege that Plaintiff ARG is a citizen of the State of New York because Plaintiff ARG is domiciled in the State of New York (Id., ¶9);

iv.     Defendants allege that Defendant TB is a citizen of the State of California because Defendant TB is domiciled in the State of California (Id., ¶10);

v.      Defendants allege that BLUM is a limited liability company organized under the laws of the State of California and that the members of BLUM are MTB Arts, Inc. and The Blum Family Trust (Id., ¶11);

vi.     Defendants allege that MTB Arts, Inc. is a citizen of the State of California because MTB Arts, Inc. is a corporation duly organized and existing under the laws of the State of California with an office and principal place of business located in the State of California (Id., ¶12);

vii.    Defendants allege that The Blum Family Trust is citizen of the State of California because the trustees of The Blum Family Trust are Defendant TB and his spouse Maria Blum, both of whom are domiciled in the State of California (Id., ¶13); and

viii.   Defendants further allege (Id., ¶¶14-18), inter alia, the following:

        a.      Defendants have satisfied their burden of proving that it appears to a reasonable probability that Plaintiffs' claim is in excess of the statutory jurisdictional amount of $75,000.00 (Id., ¶¶14-15);

        b.      Federal courts generally evaluate jurisdictional facts, such as the amount in controversy, on the basis of the pleadings, viewed at the time Defendants file the notice of removal (Id., ¶14); and

        c.      In Plaintiffs' Complaint, Plaintiffs contend that Defendants' alleged breach of a retainer agreement for legal services has damaged them in an amount no less than $150,000.00 (Id., ¶15).

**PART 137 OF THE RULES OF THE CHIEF ADMINISTRATOR OF THE COURTS OF THE STATE OF NEW YORK**

8.      Part 137 of the Rules of the Chief Administrator of the Courts does not

apply in this action as the amount in dispute in this action exceeds $50,000.00.

## **BACKGROUND**

9.      In or about 1994, Defendant TB and Jeff Poe ("JP") co-founded BPLLC in Santa Monica, California and were the co-principals and/or co-owners of Blum.  In or about August 2023, it was announced that co-founder JP was exiting BPLLC.  Upon information and belief, on or about October 17, 2023, BPLLC filed an Amendment of Articles of Organization of BPLLC, changing its name to BLALLC.  Upon information and belief, on or about October 17, 2023, it was announced that BPLLC now will be known as BLUM and, in the Spring of 2024, will relocate its New York gallery from its current Upper East Side New York location to a two-floor, 6,200 square-foot gallery at 9 White Street in Tribeca, New York.

10.     Upon information and belief, Defendant TB presently is the principal shareholder or sole owner of BLUM.  At all relevant times herein, prior to JP's departure from Blum in or about October 2023, JP had full requisite corporate and legal power and authority, and actual and apparent power and authority, to enter into, negotiate, perform and/or consummate agreements on behalf of BPLLC and to bind BPLLC to such agreements.  Upon information and belief, at all relevant times herein, prior to JP's departure from Blum in or about October 2023, JP was a Manager of BPLLC.  As an example of JP's power and authority, on October 31, 2008, when BPLLC filed a Certificate of Amendment with the Secretary of State of the State of California, amending BPLLC's name from 'Blum and Poe, LLC' to 'Blum & Poe, LLC,' the Certificate of Amendment, dated October 21, 2008, was signed by "Jeffrey Poe, Manager."

11.     At all relevant times, JP was well aware that Plaintiff ARGPC is a law firm specializing in civil commercial litigation and transactional matters with an

emphasis on art and entertainment law, including, <u>inter alia</u>, New York State sales tax law with respect to the shipment of works of art purchased from New York galleries to locations outside New York.  Plaintiff ARG is a highly experienced and skilled attorney who has practiced for more than 50 years before the New York State bar.

12.     In or about September 2018, JP—then a 50% co-owner of BPLLC—approached ARG, on behalf of BPLLC, for legal advice regarding sales tax disputes with the New York State Department of Taxation and Finance ("NYSDTF") as set forth below.

13.     Initially, JP purposefully downplayed the serious nature of BPLLC's potential sales tax liability and misrepresented to ARG the amount allegedly owed by the California and New York branches of BPLLC to the NYSDTF, so that Plaintiffs' legal fees would be far less than if Plaintiffs knew that BPLLC's potential sales tax liability was not $800,000.00, but rather in excess of $4,700,000.00.

14.     In or about that time, ARG advised JP that ARGPC's legal retainer for legal services in connection with BPLLC's New York State sales tax issues would be no less than $150,000.00.  The foregoing legal fees would be a small price to pay to obtain the elimination or favorable settlement of BPLLC's multi-million dollar New York sales tax liabilities in large part as a result of Plaintiffs' litigation and negotiation strategies, legal research opposing the NYSDTF's arguments concerning "common carrier" jurisprudences, referrals to accountants and attorneys concentrating on New York sales tax issues, and constructing an overall litigation strategy to combat the NYSDTF's exorbitant assessments and penalties against BPLLC.  JP acknowledged that ARGPC's retainer would be no less than $150,000.00 and continued to utilize Plaintiffs' legal

services.

15.     It was common knowledge in the art world during the early- to mid- 2010s
that the New York Attorney General and the NYSDTF were conducting aggressive
investigations, conducting detailed audits and assessing often exorbitant sales tax
liabilities against many of the major New York art galleries and dealers, including
interstate galleries who conducted business in or maintained galleries in multiple states,
including in New York.  The New York Attorney General and the NYSDTF held the
vendors liable for collecting sales tax, which constituted almost 10% of every art sale.

16.     For example, just a year and a half earlier in July 2016, the New York
Attorney General's office issued a press release, dated July 19, 2016 (available at
https://www.pressreleasepoint.com/ag-schneiderman-announces-428-million-settlement-
international-art-dealer-gagosian-gallery-failure-c), announcing a $4.2 million dollar
settlement with Gagosian Gallery based in New York, stating:

> "Additionally, the Attorney General alleges that from at least 2012 to 2015,
> Gagosian Gallery Inc. sold a significant volume of art in New York that was
> shipped out of state, for which it should have, but did not, collect New York state
> and local sales tax.  Under New York law, New York sales tax is due if
> possession is transferred by the vendor to the purchaser or purchaser's agent
> within New York.  When it turned over art to shipping companies within New
> York that were ***not common carriers*** like UPS, FedEx or the U.S. Postal Service,
> but rather, ***were contract carriers*** acting as the purchasers' agents, ***Gagosian***
> ***should have collected and remitted sales tax***" (emphasis supplied).

17.     During JP's and ARG's communications in September 2018 and
thereafter, JP communicated to Plaintiffs that he was extremely worried and concerned
regarding BPLLC's possible liability to the NYSDTF for past due sales tax payments,
including penalties and interest.

18.     Until JP consulted with Plaintiffs in or about September 2018, BPLLC had

no ***independent*** legal counsel whatsoever to advise them or consult with their local

accountants, who were not making any progress in opposing or negotiating the

NYSDTF's sales tax assessments, audits and/or liabilities against BPLLC.  JP was deeply

frustrated and upset about the foregoing.  At that time in 2018, BPLLC was a member of

the Art Dealers Association of America ("ADAA").[2]  JP once served a two-year term on

the ADAA's committee.  The ADAA had its own counsel, Jo Backer Laird, Esq. of

Patterson Belknap Webb & Tyler LLP ("Laird"), who from time to time would issue

bulletins, memoranda and/or alerts concerning various issues of concern to art dealers

and galleries, including, without limitation, sales tax issues.

      19.    JP complained bitterly and in a derogatory fashion to Plaintiffs about

Laird, the ADAA's legal counsel, and how said counsel was not assisting JP, BPLLC or

their local California accounting firm Thong, Yu, Wong & Lee, LLP ("TWWL").  Until

about September 2018, TWWL, located in Los Angeles, California, was dealing with the

NYSDTF on behalf of BPLLC concerning BPLLC's significant sales tax disputes.  JP

advised Plaintiffs that JP did not have faith that the ***California*** accounting firm TWWL

could handle a complex multi-million dollar ***New York*** sales tax liability matter before

---

[2] The ADAA describes itself on its website, at https://artdealers.org/about/mission, as,
inter alia:

> "The Art Dealers Association of America (ADAA) is a nonprofit membership
> organization of the nation's leading galleries in the fine arts... Each ADAA
> member is an experienced and knowledgeable dealer in their field.  ADAA has
> over 200 member galleries across nearly 40 U.S. cities.
>     . . .
> Membership in ADAA is by invitation of the Board of Directors...
>     . . .
> Membership in the ADAA provides exclusive benefits including:
> ... • Legal and legislative alerts..."

the NYSDTF.

20.     JP and BPLLC immediately sought and was able to fully utilize ARG's legal expertise concerning, inter alia, the NYSDTF's understanding, interpretation and application (possibly retroactively) of "common carrier" jurisprudence relating to the imposition of New York sales tax when a work of art is delivered to the custody of a "common carrier" for delivery by the "common carrier" to the customer *__outside__* New York State for use *__outside__* New York State.  JP learned for the first time from ARG the specifics of the law concerning the "common carrier" issue.

21.     Generally speaking, in 2018, it was the NYSDTF's and the New York State Attorney General's position that under New York law, New York sales tax is due if possession of a work of art is transferred by the seller to a shipping company within New York (regardless of whether delivery is to be made within or outside New York) and the shipping company has been selected and paid for by the purchaser and is *__not__* a common carrier like UPS, FedEx or the U.S. Postal Service, but rather is a contract carrier acting as the purchaser's agent.  In such a circumstance, the NYSDTF and the New York State Attorney General contended that the seller should collect and remit New York sales tax because the NYSDTF and the New York State Attorney General deemed possession by the purchaser to have occurred in New York, triggering a sales tax.

22.     Utilizing Plaintiffs' vast experience and contacts in handling New York State sales tax issues and NYSDTF penalties, audits and assessments concerning the sale of works of art, Plaintiffs introduced JP to tax accountant David Lifson, CPA ("Lifson") of Crowe, LLP in September 2018.  Plaintiffs and JP discussed that Lifson, who specializes in art world sales tax issues, working together with Plaintiffs, may be able to

resolve the NYSDTF's sales tax penalties, audits and assessments without further legal intervention. Upon information and belief, BPLLC formally retained Lifson in or about October 2018. JP directed Lifson to discuss with ARG the NYSTDF's sales tax audits and/or assessments against BPLLC.

23.     After Lifson was retained, Plaintiffs expended a substantial amount of time and effort explaining to JP and to Lifson the quite complex "common carrier" issues, including, inter alia, the NYSDTF's interpretation of the "common carrier" issues, the definition of "common carrier," how the "common carrier" issues affect the imposition of a sales tax on sales that do ***not*** use a "common carrier" and how the NYSDTF's interpretation of "common carrier" and imposition of sales tax related thereto was wrong as a matter of law, conflicted with prior New York case law and defied common sense.

24.     Commencing in or about September 2018, ARG provided JP and Lifson with New York case law and a number of legal points and strategies for BPLLC and Lifson to use in their negotiations with the NYSDTF.

25.     At the time Plaintiffs began counseling Defendants, legal guidance on determining "place of delivery" was sparse as it was basically confined to some case law and a few advisory opinions from the Department of Taxation and Finance.[3] In 2015, the NYSDTF issued Tax Bulletin TB-ST-155, dated August 6, 2015, on the topic of sales and use tax ("TB-ST-155"). TB-ST-155 provided, in pertinent part, that if the seller

---

[3] See, e.g., State of New York, Commissioner of Taxation and Finance Advisory Opinion, dated December 15, 2008 (also known as "TSB-A-08(53)S"), referencing, inter alia, 20 NYCRR 525.2(a)(3), New York Tax Law §1213 and Sales and Use Tax Regulations §526.7(e).

ships the goods by "common carrier," such as the U.S. Postal Service, FedEx or UPS, or if the seller arranges shipment by a private or contract carrier, the State where the goods are delivered determines the sales tax due. However, if the ***purchaser*** makes arrangements for the goods to be picked up by a common carrier or private contract carrier, or if the goods are delivered to an employee, agent or representative of the purchaser, sales tax is due based upon that location.

26.     In Plaintiffs' opinion, the NYSDTF's 2015 TB-ST-155 included an unrealistically narrow definition of "common carrier." TB-ST-155 posed a particularly acute problem for art galleries as valuable art purchased by an out-of-state purchaser usually requires special handling that, for many reasons unrelated to sales tax, the purchaser may want to control. When purchasing a valuable, fragile piece of art, like a sculpture or a large painting, which needs to be packed with extraordinary care and shipped through a service that specializes in handling that type of art, the purchaser generally will want to make those arrangements himself. In such a case, New York sales tax would be due if the out-of-state purchaser took delivery or sent his agent to take the valuable art from New York to its ultimate destination in another State or foreign country because the NYSDTF and the New York State Attorney General would deem delivery and possession by the purchaser to have occurred in New York.

27.     Compounding these legal complexities is that, upon information and belief, the 2015 TB-ST-155 was withdrawn from the NYSDTF's website shortly after it was issued ***without explanation!*** TB-ST-155 no longer is accessible on the NYSTDF's website ***except*** for a single reference on page 32 of the NYSDTF Publication 750, titled "A Guide to Sales Tax in New York," available at

11

https://www.tax.ny.gov/pdf/publications/sales/pub750.pdf, with a link to TB-ST-155 that

takes the reader to a note on the NYSDTF website at

https://www.tax.ny.gov/pubs_and_bulls/tg_bulletins/st/delivery_rules.htm, stating

***"Sorry, we can't find the page you're looking for."***

28.     Accordingly, BPLLC's sales tax issues with the NYSDTF were multi-

layered, attended by sometimes conflicting and confusing case law and a substantive tax

bulletin issued by the NYSDTF which was subsequently withdrawn without explanation,

requiring a nuanced legal approach to dealing with the NYSDTF and the Administrative

Law judges handling BPLLC's sales tax issues.

29.     In subsequent e-mail exchanges and communications between Plaintiffs

and Lifson in December 2021, Lifson advised Plaintiffs, inter alia, Lifson's

communications and meetings with the NYSDTF auditors, as follows:

    i.     BPLLC's possible liability to the NYSDTF concerned ***four*** different audits and/or assessments by the NYSDTF;

    ii.    Two of those four NYSDTF audits and/or assessments concerned sales conducted by the New York branch of BPLLC and the other two concerned sales conducted by the California branch of BPLLC;

    iii.   One of the NYSDTF's four sales tax assessments against BPLLC in the sum of $1,035,444.00 on 529 sales conducted by the California branch of BPLLC between December 2014 and November 2016 was reduced to $182,198.00. Lifson and BPLLC were protesting six sales for which the NYSDTF assessed sales tax liability. This assessment was appealed to the New York State Division of Tax Appeals;

    iv.   A second audit of the California branch of BPLLC for the period between December 2016 and May 2019 had not yet commenced;

    v.    One of the NYSDTF's four sales tax assessments against the New York branch of BPLLC for the period between September 2014 and May 2017 totaled $776,795.00, but was on hold by the

NYSDTF pending a decision on the assessment in point iii. above by the New York State Division of Tax Appeals;

vi.   A second audit of the New York branch of BPLLC for the period between June 2017 and August 2019 asserted an approximate $2.9 million additional sales tax due; and

vii.  The possible sales tax liability BPLLC had been facing was substantial as three of the four audits and/or assessments totaled in excess of $4,700,000.00.

30.   In December 2021, Plaintiffs had several communications with JP and Lifson, including, without limitation, analyzing and discussing the then-recent New York sales tax case Parikh v. Schmidt, 157 N.Y.S.3d 603 (3d Dep't 2021), issued on or about December 9, 2021.

31.   Lifson and his accounting firm did not and do not litigate before the New York State Division of Tax Appeals. As BPLLC was not making sufficient progress with the NYSDTF and was nowhere near securing a resolution to the NYSDTF's proposed assessments and audits, BPLLC required the legal services of a tax law practitioner to litigate the matter before the New York State Division of Tax Appeals.

32.   For several of the preceding years, Plaintiffs had consulted on a regular basis with Art Rosen, Esquire ("AR") at McDermott Will & Emery on another New York sales tax issue where the NYSDTF claimed sales tax in connection with the sale of works of art. AR was a former deputy counsel of the NYSDTF and was and is known as one of the country's premier tax and sales tax attorneys and litigators. Again, using his vast contacts, ARG introduced JP and BPLLC to AR. At that time, AR's associate was Katie Quinn, Esquire ("KQ"). ARG consulted with AR, KQ and Lifson on a regular basis concerning BPLLC's sales tax issues and possible multi-million dollar sales tax penalties assessed against it by the NYSDTF.

13

33.     On or about December 22, 2021, JP advised ARG via text message, inter alia, that pursuant to ARG's recommendation and conversations with JP and Lifson, BPLLC decided to retain the legal services of AR and his law firm McDermott Will & Emery to further assist BPLLC in its dispute with the NYSDTF and to handle the appeal pending in the New York State Division of Tax Appeals.

34.     Thereafter, JP, on behalf of BPLLC, continued to consult with ARG on a regular basis after retaining AR.  When KQ moved to Jones Walker LLP in or about May 2023, BPLLC retained KQ and her new law firm, and JP continued to consult with ARG and KQ on a regular basis concerning BPLLC's sales tax issues.  Following KQ's move to Jones Walker LLP, KQ advised and confirmed to Plaintiffs that JP had provided full authorization for KQ to continue discussing BPLLC's sales tax issues with Plaintiffs.

35.     While AR and KQ were representing BPLLC, JP communicated with ARG to discuss updates, JP's concerns and ARG's opinions and advice with respect to the progress of the BPLLC sales tax matters with the NYSDTF, including the progress of BPLLC's substantial sales tax liabilities being litigated at the New York State Division of Tax Appeals.  JP repeatedly asked for ARG's legal opinion as to whether BPLLC's opposition to the NYSDTF was proceeding in the right direction and repeatedly sought ARG's legal counsel concerning potential legal strategies.  ARG routinely provided legal advice and opinions to JP and BPLLC concerning all of the foregoing matters and routinely addressed all of their questions and concerns.

36.     On May 10, 2023, KQ e-mailed ARG with an update concerning BPLLC's sales tax liability.  KQ advised ARG that BPLLC's potential sales tax liability had been reduced to approximately $60,000.00 and that KQ expected to negotiate a

14

settlement for between approximately $10,000.00 and $15,000.00. ARG and KQ further consulted with each other on the BPLLC matter as late as July 2023.

37.     Ultimately, AR, KQ, McDermott Will & Emery, Jones Walker LLP and/or Lifson successfully defended BPLLC against the NYSDTF. BPLLC's potential multi-million dollar New York sales tax dispute with the NYSDTF was successfully resolved in BPLLC's favor for a de minimis sum of less than $30,000.00. Had it not been for Plaintiffs' agreed-upon legal services rendered to BPLLC, which empowered BPLLC to vigorously contest the NYSDTF's assessment of sales tax liability:

> i      JP and BPLLC never would have met and retained Lifson;
>
> ii     JP and BPLLC never would have met and retained AR, KQ and/or their respective law firms;
>
> iii.   ARG never would have advised Lifson and JP that the NYSDTF's position concerning BPLLC's potential multi-million dollar sales tax assessment was contrary to New York caselaw; and
>
> iv.    BPLLC's potential multi-million dollar New York sales tax liability would not have been resolved for a de minimis sum.

38.     Notwithstanding that ARG had many conversations and communications with JP, Lifson, AR and KQ beginning in September 2018 concerning BPLLC's potential New York sales tax liability, JP never advised ARG that:

> i.     JP planned on exiting BPLLC;
>
> ii.    JP planned on exiting BPLLC without having BPLLC pay its unpaid legal fees to Plaintiffs;
>
> iii.   Defendants TB, BPLLC and/or its apparent successor BLUM were unaware or were never advised by JP that JP had agreed, on behalf of BPLLC, to pay legal fees to ARGPC; and
>
> iv.    BPLLC's Director of Finance, Amy Garofano, had been dealing with BPLLC's potential sales tax liabilities and was communicating with AR and KQ, who were recommended to JP

and BPLLC by ARG.

39.     During conversations between 2018 and 2023, JP repeatedly advised ARG that they would work out a reasonable legal fee when the NYSDTF matters were resolved.  ARG trusted JP because they had been friends over a period of 20 years. Accordingly, ARG had no reason to disbelieve that JP and BPLLC would work out a reasonable legal fee with ARG when the NYSDTF sales tax matters were resolved and that JP and BPLLC would pay ARG a fair and reasonable amount based on the parameters set by ARG's normal retainer amount of no less than $150,000.00.

40.     Throughout 2022 and 2023, JP repeatedly acknowledged and agreed that Plaintiffs were owed a legal fee and that TB, BPLLC and JP would resolve the issue of ARG and ARGPC's unpaid legal fees when the NYSDTF matters were resolved. Though the NYSDTF matters effectively were resolved in mid-2023, JP repeatedly conjured excuses to delay speaking with ARG concerning a resolution of Plaintiffs' outstanding unpaid legal fees.  JP claimed that he could not speak with ARG in June or July 2023 as JP purportedly would be out of town for approximately six weeks in June and July 2023 and instead promised to speak with ARG in August 2023 to resolve the outstanding fees issue.  In August 2023, JP again insisted that he could not speak with ARG as JP's mother or mother-in-law purportedly was in town.

41.     In or about the end of August 2023 or the beginning of September 2023, shortly before JP exited BPLLC without informing Plaintiffs, JP advised ARG for the first time during a telephone call that BPLLC would not pay ARGPC's unpaid legal fees. JP refused to make any payment to Plaintiffs despite conceding that Plaintiffs had provided legal advice, case law and a detailed strategy for defeating the NYSDTF's

16

multiple threats, assessments and audits concerning BPLLC's sales tax liabilities and penalties and despite admitting that Plaintiffs had referred BPLLC to accountant Lifson and attorneys AR and KQ (who specialized in New York State sales tax matters) and despite admitting that Plaintiffs had engaged in numerous lengthy, detailed discussions with AR, KQ and Lifson, including, without limitation, constructing legal strategies with them.  ARG responded that JP had promised Plaintiffs, since Plaintiffs' very first involvement in the sales tax matter in 2018, that JP and BPLLC would work out a fee with and pay Plaintiffs.

42.    ARG was shocked that notwithstanding JP's acknowledgement of the host of legal services provided by Plaintiffs to BPLLC, notwithstanding JP's repeated promises to Plaintiffs that he and BPLLC would resolve the outstanding fees issues with Plaintiffs and notwithstanding JP's and TB's longstanding personal friendship with ARG, JP was refusing to pay Plaintiffs or even negotiate with Plaintiffs concerning Plaintiffs' outstanding legal fees owed by BPLLC.

43.    Plaintiffs' communications between 2018 until in or about August 2023 with BPLLC concerning BPLLC's sales tax issues were exclusively with JP.  Upon information and belief, BPLLC's communications between 2018 until in or about August 2023 with Lifson, AR and KQ concerning BPLLC's sales tax issues were exclusively with JP.

44.    In or about the end of August 2023 or the beginning of September 2023, after JP terminated his partnership with TB and exited BPLLC (and subsequent to ARG's and JP's telephone conversation in which JP refused to pay any legal fees to Plaintiffs), ARG telephoned TB and, inter alia, provided TB with a summary of the legal services

provided by Plaintiffs to JP and BPLLC since 2018 and of ARG's disturbing telephone conversation with JP.  In response, TB stated to ARG, <u>inter alia</u>, the following:

    i.      JP "is a fuck-up;"

    ii.     JP "fucked up" so many things at BPLLC;

    iii.    JP never attended art fairs (stating, "Do you think that motherfucker ever attended an art fair?");

    iv.    JP left TB and BPLLC with a host of problems;

    v.     TB is not surprised to hear how JP treated ARG; and

    vi.    TB and ARG always have been friends.

45.    During the foregoing telephone conversation between TB and ARG, TB acknowledged that JP had been handling the NYSDTF sales tax matter on behalf of BPLLC, acknowledged and agreed that BPLLC owed Plaintiffs a substantial legal fee and promised ARG that TB will "take care of" ARG's outstanding legal fees.  TB further stated, "We'll straighten this out" and "We've always been friends."

46.    ARG and TB both mentioned to each other that they were planning on attending the Paris+ par Art Basel 2023 modern and contemporary art fair ("Paris Art Basel 2023") in Paris, France (scheduled to commence on or about October 13, 2023 and to close on or about October 22, 2023).  TB represented to ARG that TB would meet with ARG in Paris, France during Paris Art Basel 2023 in an attempt to settle Plaintiffs' unpaid legal fees claim.  On or about September 23, 2023, ARG and TB texted each other, confirming that they would both attend Paris Art Basel 2023 and would meet there, with ARG texting TB, <u>inter alia</u>, "Let's talk at Paris Par…" and "I'll come by" and TB agreeing to meet, responding "Cool."

47.    TB's foregoing representations to ARG in or about the end of August

2023 or the beginning of September 2023 proved to be demonstrably false.  On October

18, 2023, while ARG and TB were both in Paris, France attending Paris Art Basel 2023,

ARG texted TB, stating, inter alia, "Let's meet… I want this resolved asap."  Following

this text, ARG met TB at BPLLC's art booth at Paris Art Basel 2023.  When ARG began

discussing with TB the outstanding legal fees owed to Plaintiffs, TB immediately cut off

ARG, stating, "I'm busy at an art fair.  You think I'm going to meet with you?" (or words

substantially similar thereto).  ARG responded, "OK, Tim" and walked away.  A short

time later, TB telephoned ARG and, in a brutally aggressive manner, excoriated ARG for

"bothering" TB at an art fair and declaring that TB and BLUM would ***not*** meet with

ARG to resolve Plaintiffs' claim for unpaid legal fees.

48.     Defendants, jointly and severally, owe Plaintiffs a sum no less than

$150,000.00 in fees for legal services provided by Plaintiffs to Defendants.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract for Legal Work and Services)

49.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set

forth herein.

50.     Commencing in or about early September 2018 and continuing to be

regularly performed, including on weekends, Plaintiffs rendered professional legal

services to Defendants.  Plaintiffs faithfully and duly performed their obligations

pursuant to the agreement for Plaintiffs to provide legal services to Defendants.

51.     On October 18, 2023, in Paris, France, TB and BLUM advised Plaintiffs

that TB and BLUM reject Plaintiffs' claim for unpaid legal fees and will not pay any

legal fees due and owing to Plaintiffs.  Defendants breached the agreement for Plaintiffs

to provide legal services to Defendants for reasons incompatible with good faith and fair

dealing.  As a direct result thereof, Plaintiffs suffered damages in a sum no less than $150,000.00.  Notwithstanding Defendants' agreement to pay ARGPC for the legal work and services performed by Plaintiffs, and Plaintiffs' due demand for payment, Defendants have made no payments whatsoever to Plaintiffs and have refused to meet with Plaintiffs to resolve the outstanding legal fees owed.  Defendants' breach of the agreement for Plaintiffs to provide legal services to Defendants was wholly unsupported by any arguable reasons and was willful, malicious and in bad faith.

52.     By reason of the foregoing, Plaintiffs have been damaged in the total sum of no less than $150,000.00, the precise amount to be proven at trial, with appropriate legal interest and attorney's fees, including, _inter alia_, all consequential and incidental damages related thereto.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Quantum Meruit)

53.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

54.     Plaintiffs rendered legal services to Defendants, in good faith, at the special request of Defendants and for which Defendants promised to pay Plaintiffs the reasonable value of such legal services.  JP and BPLLC acknowledged and agreed in September 2018 that ARGPC's retainer would be no less than $150,000.00.

55.     At all times when Plaintiffs' legal services were being rendered to Defendants, Defendants knew that Plaintiffs were rendering legal services, in good faith, to Defendants.

56.     Defendants accepted and received the benefits of the legal services rendered to Defendants by Plaintiffs.

57.     The legal services rendered by Plaintiffs to Defendants reasonably were worth a sum no less than $150,000.00.

58.     Despite due demand, Plaintiffs have received no payments from Defendants, leaving a balance due and owing of no less than $150,000.00.

59.     By reason of the foregoing, Plaintiffs have been damaged in the total sum of no less than $150,000.00, the precise amount to be proven at trial, with appropriate legal interest and attorney's fees, including, inter alia, all consequential and incidental damages related thereto.

### JURY DEMAND

Plaintiffs demand a jury for all claims stated herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, as follows:

i.      On the First Cause of Action, against Defendants, jointly and severally, in favor of Plaintiffs for a sum no less than $150,000.00, with appropriate legal interest, and all consequential and incidental damages related thereto;

ii.     On the Second Cause of Action, against Defendants, jointly and severally, in favor of Plaintiffs, for a sum no less than $150,000.00, with appropriate legal interest, and all consequential and incidental damages related thereto;

iii.    Costs, expenses, disbursements and reasonable attorney's fees in an amount to be awarded at trial; and

iv.   Such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
       December 7, 2023

AARON RICHARD GOLUB, ESQUIRE, P.C.
*Attorneys for Plaintiffs Aaron Richard Golub, Esquire, P.C.,*
*and Aaron Richard Golub*

BY: _____
                  Nehemiah S. Glanc

24 East 64th Street, 5th Floor
New York, New York 10065
(212) 838-4811
nglanc@argolub.com


To:   EISNER LLP
      *Attorneys for Defendants*
      152 West 57th Street, 48th Floor
      New York, New York 10019
      Phone: (646) 876-2600